# THE DEXTER SULPHITE PULP AND PAPER CO. *vs.* McDONALD & FISHER.

*Construction of a Contract for the Manufacture and Sale of Paper Ac-
cording to Sample—Interpretation of a Contract by Acts of the Par-
ties—Evidence—When Special Exception to Granted Prayer is Nec-
essary—Harmless Error.*

Before bidding on a contract to supply the Federal Government with a
quantity of rope Manilla paper, the plaintiffs sent a sample of the paper
required to the defendant and inquired the terms upon which it would
be supplied. After the exchange of several letters defendant agreed to
furnish the desired quantity of paper which would comply with the
Government requirements upon designated terms. Thereupon plain-
tiffs made a contract in their own names with the Government, but
subsequently the defendant failed to supply any paper under its agree-
ment. In an action for breach of the contract, the defense was that in
making the bid and obtaining the contract the plaintiffs were acting as
agents for the defendant company; that since the plaintiffs had put in a
higher bid than that of which the defendant was notified, the defendant
was discharged from any obligation; also that the defendant had not
been informed, before making its contract, that the Government would
subject the paper to a certain acid test to ascertain its correspondence
with the sample, and that the defendant company could not make
paper which would pass that test. *Held*, upon a construction of the
contract, that the plaintiffs did not make the bid as agents of the de-
fendant, but that the agreement between the parties was for a direct
sale of the paper by the defendant to the plaintiffs.

*Held*, further, that since the defendant company had agreed to furnish
paper equal to the sample it was bound to know what tests such paper
could undergo, and moreover that after the defendant was notified of
the requirement of the acid test it held itself out as able to furnish
the required paper, and thereby waived any right to object to the re-
quirement of that test.

The interpretation which the parties themselves place upon a contract by
their acts in performance is to be considered in ascertaining the true
construction of the contract and the intention of the parties.

So where the question is whether the plaintiffs in bidding for and obtain-
ing a public contract acted as agents for the defendant who was to
manufacture the goods called for by the contract, or whether the de-
fendant had agreed to sell the goods directly to the plaintiffs, the fact

that the defendant did not see or ask for the contract made between the plaintiffs and the Government indicates that the defendant did not regard the plaintiffs as his agents.

The objection that a granted prayer submitted a question of law to the finding of the jury cannot be urged on appeal unless a special exception to the prayer on that ground was taken in the trial Court, as is required by Code, Art. 5, sec. 9.

The fact that a prayer relating to the measure of damages is abstract in form and does not sufficiently refer to the facts of the case in the application of the rule does not constitute reversible error when it is apparent that no injury to the appellant was thereby occasioned.

In an action for breach of a contract by the defendant company to manufacture and furnish paper equal to a certain sample and in accordance with certain specifications, the following questions asked an officer of the defendant company were properly excluded: "Could you have furnished paper in accordance with the specifications and sample?" "What would you have said if you had been advised that paper would not be accepted which contained sulphite pulp in greater quantity than the standard sample?" "What have you to say as to plaintiffs' testimony that he did not know what kind of paper defendant's factory made?" "Can rope or jute paper be made from unbleached sulphite?" These questions are irrelevant.

Appeal from the Superior Court of Baltimore City (BAER, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Elon R. Brown* and *Alfred J. Carr*, for the appellant.

*Edward Duffy* (with whom were *Bond & Robinson* on the brief), for the appellees.

JONES, J., delivered the opinion of the Court.

In this case the appellees sued the appellant in the Court below alleging in the first count of their *narr.* that they were wholesale paper dealers and that the defendant was a corporation engaged in the manufacture of paper; that on the 19th of December, 1902, the Government of the United States issued printed forms for proposals for furnishing rope Manilla paper for the public printing and binding from March 1st, 1903, to February 29th, 1904; that the appellees informed the appellant that they intended proposing to furnish to the Govern-

ment the said paper and requested the defendant to name to them a price which it would charge for manufacturing said paper of which they sent to the appellant a sample; that the appellant named to them a price on the basis of which they made a proposal to furnish to the Government said paper; that the appellees were the lowest bidders on the said proposal and had awarded to them a contract to furnish said paper and were required to give a bond of indemnity to secure the performance of the said contract; that they notified the appellant of the same and it thereupon agreed with the appellees to manufacture for and furnish them the paper necessary to carry out said contract—said paper to be in accordance with the sample theretofore furnished the appellant "and to be delivered in Washington at the price of four dollars and seventy cents ($4.70) per hundred pounds less four per cent as a commission on and less three per cent discount for payment within thirty days, no discount or commission to be allowed on freight;" that the appellees thereafter demanded of the appellant the paper and it refused to deliver the same. And in the second count that the appellant agreed to manufacture for the appellees a quantity of paper—the same to be in accordance with a sample furnished by the appellees to the appellant but refused to so manufacture said paper.

The defendant filed the general issue pleas and the case was tried before a jury. The questions in the case are brought up by eight exceptions to the rulings of the Court below; the eighth of which is to the action of that Court upon the prayers of which the appellees, as plaintiffs below, offered three and the appellant, as defendant, eight. The Court granted all of the former and refused all of the latter. The principal question in the case is presented by this action of the Court upon the prayers. Other exceptions relate to questions arising on rulings upon the evidence.

The evidence consists for the most part of a voluminous correspondence between the parties extending over a period of several months from the 20th of December, 1902, to the 6th of July, 1903. The reciprocal rights and obligations of

the parties with reference to which the questions raised in this case are to be determined depend upon the effect to be given to what appears in this correspondence. In passing upon these questions therefore it will be necessary to set out and ascertain the purport of what thus appears. On the 20th of December, 1902, the appellees wrote the appellant as follows:

"Baltimore, Md., Dec. 20, 1902.

Dexter Sulphite Pulp & Paper Co.

Dexter, N. Y.

Gentlemen:

The Government Printing Office will open bids on Jan. 12th, for three thousand and five hundred reams, they call Rope Manilla, but we are pretty sure there is no rope in it. We enclose you a sample and would like to bid for you on this item, as we were so successful with your paper in the Interior Department, and they like it very much. This item was awarded last year, we think at five and one-tenth cents, but will advise you positively about this in a few days. The paper is called for in several sizes all good sizes and weights. It is put up flat in frames, and is trimmed square on four sides, and the orders are always good large ones, and nice runs. We should like to bid on these different Washington orders for you, and feel that if you want the business we can get you a good share of it, and be as successful with your paper as any one. If you do not care to bid, will you kindly return our samples. In bidding on the Government Printing Office, you do not need to submit a sample, but must be to match the Government Printer's sample in strength, etc., which we think would not be very hard to do with your papers."

(Signed) McDonald & Fisher, per McD.

It was, in connection with the offer in evidence of the foregoing letter, testified that the sample of paper which would be wanted as indicated therein, was sent to the appellant with the letter. On December 22d, 1902, the appellant replied to the letter of the appellees just set out as follows:

Messrs. McDonald & Fisher.

Gentlemen:

Replying to yours of the 20th. The sample of paper which you have sent us, as rope Manilla, contains no rope whatever. We note that it calls for a tensile strength of 55 on a Mullen Testor. Of course we can get a great deal better test than this. Now in reference to price. You gentlemen go ahead

and get the order if you can get it anywhere near the price which you mentioned, and we will stand back of you.    The paper we would furnish you would be up to requirements both as to color, finish, tensile strength, and everything else.    We therefore trust you will be successful.

(Signed) Dexter Sulphite Pulp & Paper Co.

On the 24th of December, 1902, the appellees wrote to the appellant this letter:

Dexter Sulphite, Pulp & Paper Co.

Gentlemen:

We enclose you samples, which the Government Printing Office are issuing and asking for a price on thirty-five hundred reams.    This paper was awarded last year at five and one-tenth cents per lb. delivered in Washington.    As rope paper was very high last year, we doubt whether there was any rope in the paper furnished.    Please let us know if you would like to bid on this item, and what price you can guarantee to match the sample enclosed, price to hold good for a year.    They go a great deal in the Government Printing Office on test of the Morrison Machine, and we think your papers would out test the enclosed.    We should like to bid for you, and will put in your price, subject only to a cash discount of four per cent., so please make your price delivered the department with the understanding, that when we pay the bill, take off four per cent., we to put in the price you give us.    Please make your price delivered in Washington as you now have freight there, which you got for the Interior contract.

(Signed) McDonald & Fisher.

The appellees wrote again on the 26th of December, 1902, as follows:

Dexter Sulphite, Pulp & Paper Co.

Gentlemen:

We have yours of December 23d in reference to the paper for the Public Printer and thank you for the same.    We felt sure that there was no rope in the paper, and that your paper would out test it.    You do not have to supply a sample to bid on this order, but to bid to match the sample of the Public Printer enclosed, in color, strength and finish, and there must be no ground wood in the paper.    These are the requirements of the Public Printer.    Now as we said before, delivered in Washington.    The paper is to be trimmed on four sides, put up flat and in frames, two reams to the bundle, and is always

good large sizes, heavy weights and long runs.    Now we want you to look at this sample, and to make us your price for same, and we will make our price to the Public Printer. We do not know just how the price will go this year, as this is not very much of a sample for quality.    Some of the jute mills may go less, so we want you to make us the very best price, at which you will match this sample, delivered in Washington, less your usual cash discount 2 % for thirty days, 3 % for ten days, and as said above, we will make our price to the Public Printer, and try to win the order, and we ask you if any one else, in or outside of Baltimore, asks you for a price for this order that you will not give it to them, but trust yourselves to us, on this department business, we will appreciate it, and bid for you only.    We expect to have an order for another car load for the Interior Department in a day or two, and will give you all the time we can to make the order. These prices go in January 12th, so we should like to have your price at once.

(Signed) McDonald & Fisher, per McD.

On the 28th of December, 1902, the appellant wrote the appellees:

Messrs. McDonald & Fisher.

Gentlemen:

Your two letters under dates of Dec. 24 & 26 at hand and answering same we beg to say that we will quote you in accordance with the sample which you enclosed a price delivered in Washington, of $4.70 per 100 lbs.    As we understand the matter, this price will be for delivery in car load lots, as it is under this freight rate that we are bidding.    You understand the terms of payment would be net payment in 30 days from date of invoice less 3 % for payment within 10 days; you would be allowed a commission of 4 % of the sale, to all of which we agree, it being understood of course, that there would be no discount or commission taken off for freight; the freight would have to be net.    We trust of course that you will succeed in landing this business.    *    *    *

(Signed) Dexter Sulphite, Pulp & Paper Co.    ·

Secy.

Answering this letter the appellees wrote January 5th, 1903. Dexter Sulphite Pulp & Paper Co.

Gentlemen:

Replying to yours of Dec. 28th we shall bid on your paper in the Government Printing Office alone, and not receive bid

from any one else.    Paper to match the sample we sent you in color and finish, and test to be equal to or better than that printed on the sample.    In other words, a tensile of 55 on the Mullen Tester to the thickness of 5 Micrometer Gauge.    We simply mention this to have the thing plain, as we have no doubt, as you say in yours of Dec. 22nd that you can get a great deal better test than called for.    Now the price is to—four dollars and seventy cents per 100 lbs. delivered in Washington, car load lots from which we are to deduct the selling commission of 4% and 3% for cash in thirty days.    In your letter you say ten days, but the Government does not pay that quickly.    It takes at least ten days to get the paper delivered and at least thirty days before we get our money, and as the orders might be large, we should want to pay you when the Government pays us, which is in thirty days, so we ask you to change that part of your quotation if you will, and make 3% thirty days from date of invoice.    We think this makes the matter plain, and we ask you if it is satisfactory.    If so, we will go ahead on these terms, and hope to get the order.    You understand that if we get this order, you will have to fill all requisitions in thirty days.    *    *    *

(Signed) McDonald & Fisher per McD.

On January 6th, 1903, the appellant wrote.

Messrs. McDonald & Fisher.

Gentlemen:

We have your favor of Jan. 5th and note contents.    In reference to 3% discount for cash in 10 days would say that we shall waive this and make it 30 days as you request.    We have taken into consideration the points referred to in reference to weight, tensile strength of paper, etc., and believe we will experience no trouble in this direction.    Trusting that you may be successful in landing this order, &c.    *    *    *

(Signed) Dexter Sulphite Pulp & Paper Co.

Secy.

January 13th, 1903, the appellees wrote that they were the lowest bidders "on the Rope Manilla Items" for which the appellant had given them price in the Government Printing Office.    January 26th, 1903, the appellant wrote the appellees: "We are very pleased to note that you landed the order for the rope paper.    We shall be in a position to take care of you when called upon to do so."    On the same date the appellees wrote appellant:    "As we have written you, the award at

the Government Printing Office on your paper has been made to us, and the contract goes into effect March 1st.   Please let us know if the accident which we heard has occurred at your mill, will delay you making this paper    *    *    *"   January 29th, 1903, the appellant wrote: "Answering your favor of the 26th beg leave to say that, as we wrote you a day or two ago, we have succeeded in buying large quantities of the best foreign and domestic sulphite which approach ours in anyway as to quality, and are keeping our paper mill in operation continuously so that we do not expect we will have any trouble in filling your government orders."    In this connection there was evidence that the appellees were in the wholesale paper business and that the appellant operated a large mill as manufacturer of paper.

In pursuance of the award by the Government Printing Office to the appellees of the contract for furnishing paper referred to in the foregoing correspondence, they executed to the Government a contract dated February 2nd, 1903, to furnish rope Manilla paper, &c., for one year from the 1st day of March, 1903, to the 29th day of February, 1904.    Among other things this contract provided that the paper was "not to contain in its manufacture any ground wood or mechanically prepared wood pulp, nor bleached or unbleached sulphite pulp in greater quantities than in the standard sample;" and among the specifications accompanying the contract was one that "no paper containing mechanically prepared wood pulp, or ground wood, will be received in any instance.    Paper will not be received which contains bleached or unbleached sulphite pulp in greater quantities than in the standard sample."    It appears in the evidence that to determine the correspondence between the Government sample and the paper to be furnished under the contract of the appellees as respects the presence in the paper of ground wood or sulphite pulp the paper would be subjected to a certain acid test.    There was not in the contract nor in the specifications any reference to the acid test and no stipulation in regard to its application.    The appellees made their bid for, and obtained, the contract in question for fur-

nishing paper at the price of $4.90 per 100 pounds for 3,500 reams of the size and weight required.

The appellant never furnished any paper under the contract, whatever that may be found to have been, that it had with the appellees either to the Government or to the appellees for the Government. As a defense to this suit brought upon this failure to furnish the paper in question, and as going to the construction and effect of the contract it had with the appellees, the appellant urges that, in making the contract with the Government for the furnishing of the paper in question, the appellees were factors; and that the meaning of the contract between the appellant and the appellees, as extracted from the correspondence, is that the latter were to make the bid for the contract with the Government "for and on behalf of" the appellant, and at the price named by it. That the appellees, not observing their duty to the appellant, departed from the authority given them and, without the appellant's knowledge, put in a different bid. That by this bid they secured a better price for the paper than that named to them by the appellant, and now claim to have made their bid and secured the contract with the Government on their own account. That a fraud was thus practiced upon the appellant and no obligation was imposed upon it to furnish the paper to carry out the undertaking of the appellees with the Government.

The appellant sets up also the further defense, that, at the time of making the contract with the appellees for furnishing paper, it was not informed that such paper would be submitted to, and would have to stand, the acid test spoken of in evidence, in consequence of which it was called upon to furnish paper it had not contracted to furnish.

On the other hand the appellees have brought their suit on the theory that they had with the Government a contract to furnish paper as specified therein; and with the appellant a contract of purchase of paper of the kind so specified to be manufactured and supplied in quantities and at the time stipulated for, to enable the appellees to carry out their contract with the Government.

The question thus raised as to the construction of the con-
tract, which is the cause of action in the case, is one upon the
decision of which the disposition of all other questions pre-
sented by the record will depend.    It is therefore the one to
be first determined.    As has been said the evidence of the con-
tract between the parties before the Court is be found in the
correspondence contained in the record; and its terms and
stipulations are to be found in that part of the correspondence
which preceded the award by the Government, to the appel-
lees, of the contract which was executed in form by them as
of the 2nd of February, 1903.    The earlier part of this cor-
respondence gives color to the contention of the appellant as
to the construction of the contract in question, but taken as a
whole and in its finality its substance and effect are stated in
the first count of the *narr.* in the case.    This is more particu-
larly evidenced by the letters of the 26th and 28th of Decem-
ber, 1902, and of the 5th and 6th of January, 1903, in which
the specific terms of the contract are expressed,    In the letter
of December 26th the appellees had said "now we want you
to look at this sample, and to make us your price for the
same, and we will make our price to the Public Printer.    We
do not know just how the price will go this year, as this is
not very much of a sample for quality;" and further on in the
same letter said "so we want you to make us the very best
price, at which you will match this sample   *   *   *   and as
said above, we will make our price to the Public Printer and
try to win the order."    Thus the appellees indicated that the
bid to the Government was to be *their* bid if the language used
is to be given its ordinary import.    That the language was
used advisedly and not inadvertently is indicated in the repe-
tition of it.    The expression "we do not know just how the
price will go this year" which accompanied that of "we will
make our bid to the Public Printer" indicated an uncertainty
in the mind of the appellees at the time as to what would be
the price they would bid.

That the appellant understood that the appellees were to
make their own bid to the Government and that it was mak-

ing a contract with the appellees, and not through them with the Government, is inferable from its answer of December 28th to the letter of the appellees of the 26th.   This answer makes no dissent from the proposition of the appellees to make "our (their) price to the Public Printer," though it is emphasized by repetition; but the appellant proceeds to name a price for its paper as asked by the appellees and then to state specifically the terms of payment.   It is not to be presumed it was proposing terms of payment to the Government.   The Government makes its own terms and parties seeking contracts with it bid on those terms.   A letter dealing with or seeking to fix the terms of the contract would, as respects the Government, be more appropriately one of inquiry rather than of dictation.   Following the letter of the 28th of December are those of the 5th and 6th of January, 1903, which made a further adjustment of the terms of the contract and brought to a finality the agreement of the parties.   The letter of the appellees of January 5th recited the terms of agreement that had been proposed up to that time and asked for a change in the terms of payment, to which, in its letter of January 6th, the appellant assented.   The changes that were thus being proposed and made up to the final consummation of the contract between the parties indicated that they were contracting as between themselves. . Neither of them could make or change terms of contract for the Government.

But this is not all that appears to indicate the true construction of the contract in question.   "Every contract is  * * * to be interpreted in connection with the surrounding circumstances; and the acts of the contracting parties in fulfillment of the contract may be regarded in order to see what interpretation they themselves put upon it and what conditions have been waived or performed; and the construction of the instrument may thus be varied by matter *ex post facto.*"   2 *Addison on Const.* 1193 (star paging.)   In this case the acts of the parties throw light upon how the contract in question was understood by them.   When the correspondence between them had resulted in an agreement in respect to the furnishing of

the paper for the object indicated the appellees made their own bid to the Government and upon the award made to them entered into a direct, independent contract with the Government which was put in form and signed by the appellees and the Public Printer.    The appellees from the first dealt with this contract as their own and began at once and continued to exert themselves towards its performance.    The appellant on the contrary manifested no concern with the Government contract, never called for it, never saw it and throughout the transactions here in question never in any way exhibited towards this contract an attitude of its being one made for or on its behalf.    It never acquainted itself with its specific provisions. It cannot consistently claim therefore that what was said and done between it and the appellees in reference to the furnishing of the paper in question had reference to any supposed direct obligation on its part under the contract with the Government.    Whatever was said and done therefore between the appellant and the appellees in reference to the carrying out of any contract for the furnishing of paper, which was the subject of correspondence between them, after they had reached their agreement, must have had reference exclusively to that agreement.    The inference from all of the evidence is to this effect. The interpretation put upon the contract in question by the conduct of the parties in entering upon its performance is therefore not in agreement with that which the appellant now contends for.

The appellant however claims to have been in ignorance of the fact that the appellees had made a bid of their own and taken the contract with the Government on their own account for supplying the paper in question.    This ignorance, as far as it existed, does not appear, from the evidence, to have been occasioned by any active concealment on the part of the appellees; nor is it consistent with the conduct of the appellant, after it was informed of the appellees' bid, to now rest a defense on that ground.    It appears in evidence that, in accordance with the terms of their agreement with the appellant, the appellees had called repeatedly on it to furnish paper to en-

able them to supply orders from the Government; that the appellant had failed to deliver any paper at all; and that the appellees were finally placed in a position when they could no longer get the indulgence of the Government and were liable to the consequences of a breach of their contract. They made an urgent call on the appellant and recived answer that the paper could not then be furnished. They then telegraphed appellant "we must furnish some paper at once and you must act." Thereupon appellant asked for an interview which was arranged to take place in New York, July 3rd, 1903. At this interview the appellees were represented by Mr. McDonald of their firm and the appellant by a Mr. James E. Campbell, its secretary. The latter testifying in this case as to what occurred at the interview said that McDonald had there said "we are getting 4.90c per pound for that paper and I expressed to him at that time my surprise and in answer to a question in the course of the general conversation, I told him it was the first time I knew that the contract had been placed at $4.90 and not at $4.70." Mr. Campbell does not say in his testimony that at the interview in question he claimed on behalf of his company that the fact that the appellees had put in their bid to the Goveanment at $4.90 instead of at $4.70 was contrary to, or inconsistent with, the contract of the appellees with the appellant. His testimony is confined to expressing his own surprise at learning the fact. On the next day after the interview just alluded to, July 4th, 1903, the appellant wrote the appellees as follows:

"Our Mr. J. E. Campbell returned to our plant this morning as per his conversation with you in New York yesterday. Both he and the writer have carefully gone over all the correspondence which has passed between our two companies in reference to the Government order. This company deplores the fact that our explosion in January last has prevented our making up a sample car load of this paper for you before this but the writer fully agrees with Mr. Campbell's position, namely, that the delay being due to cause entirely beyond our control this company is not bound either in a moral or a technical sense for such delay, or its consequences. In a matter of this kind, involving as it does a large amount of money

justice to our company demands that all sentiment be laid aside and that we proceed strictly along business, lines. We wish that you would, in accordance with suggestions from our Mr. Campbell, ascertain definitely whether or not a paper matching the Government sample as regards tensile strength, color and finish, and acid resisting qualities, would pass muster provided it were made entirely of unbleached sulphite pulp. The letter which the Warren Mfg. Co. received from Dobler & Mudge and which was read to you, seems to indicate that only a certain percentage of unbleached sulphite may be used. Of course if such conditions were imposed we should ·have been notified of same before you offered your bid. Another fact to which we would call your special attention, is that no copy of the Government specifications was sent to us, and when we quoted you it must have been understood by you that such paper as we would furnish, would be made entirely of our own sulphite. In fact, one of your recent letters suggests that we try the addition of a small amount of jute if possible. We feel that under all the existing conditions no other course than the · one outlined above, is open to us, and we sincerely trust that you gentlemen will succeed in so arranging matters that no loss of any amount will be sustained by you.    *    *    *

(Signed) Dexter Sulphite Pulp & Paper Co., Treas.

There is in the record some testimony going to show that the appellant may have had notice of the price bid by the appellees before this; but however that may be, it certainly had this knowledge through its official, Mr. Campbell, at the time the foregoing letter· was written. The letter was written to excuse or justify the failure of the appellant to furnish the paper as agreed between it and the appellees; yet there is no suggestion in it of such justification on the ground of the appellees having put in their bid to the Government as it did. This is based on an altogether different ground; and there is in the letter a plain recognition that the appellant's contractual relations, in respect to the furnishing of paper were with the appellees and not understood to be with the Government.

It is made to appear therefore, from the considerations that have been adverted to, that the interpretation which the parties themselves put upon the contract in suit is that which has been indicated as appearing from the correspondence.

As to the defense based on considerations respecting the acid test spoken of in the evidence, as has been said, there is no reference in the Government contract or specifications offered in evidence to an acid test; but it appears in evidence that this test is applied to determine whether the paper furnished under contract with the Government accords with the specifications and with the sample which the Government supplies as a standard. It is perhaps sufficient to say of the appellant's contention in respect to the acid test that it is not explained in the evidence why, as a manufacturer of paper, it could not, when furnished with a sample of the paper required, determine from that whether it could or could not manufacture a paper that would stand the same test as the sample—that is to say, to be in every respect like the sample. With no further explanation of this than is afforded it is difficult to appreciate the force of the appellant's contention on the point under consideration when we find it writing to the appellees, with sample in possession, "the paper we would furnish you would be up to requirements both as to color, finish, tensile strength and everything else;" and after appellees had asked for a price at which it could "guarantee to match the sample enclosed" making to them a price "in accordance with the sample enclosed." The appellant thus certainly held itself out as knowing that it could furnish the paper required. Further than this, if it could claim as a right that it should have been distinctly informed of the acid test to be applied to the paper it was to furnish, before the contract to furnish it was consummated, it would seem that such right was clearly waived, because the evidence shows that as early as February 9th, 1903, in the course of the correspondence with the appellees it had its attention called to the acid test and throughout the subsequent correspondence it continued to hold out to the appellees the promise of furnishing paper that would meet requirements. As to this it will be necessary to quote but one letter written as late as June 22nd, 1903, at the instance of the appellees, by the appellant to the Public Printer which is as follows:

"Messrs. McDonald and Fisher have enclosed to us your letter to them under date of June 19th in reference to Rope Manilla paper to be furnished according to their contract. I beg to say that a disastrous explosion which occurred in our plant some months ago shut us down completely, and although we have bent every effort towards the repair of our property, it has only been during the past week that we have succeeded in getting our mill in operation. We wired McDonald and Fisher that your order was then on our machines and after paper was made we sent them samples of same telling them that the paper was not satisfactory to us and we knew would not be yourself, and for this reason we withheld shipment of same telling them that we would make them up another carload at once. The stock for this paper requires the most careful kind of handling, which takes time, and we believe without doubt that we will be able to make you a shipment of your order during the next week, and we very much trust that you will extend to us the courtesy of a further short delay. We can very well appreciate your position of impatience with reference to the shipment of this paper and beg to assure you that you are no more anxious for the delivery of same than we are to ship. In all fairness to McDonald and Fisher, we must again repeat that their letters to you were entirely in accordance with our letters to them and the delays have been unavoidable.

(Signed),    Dexter Sulphite Pulp & Paper Company.
J. E. Campbell, Secty.

The foregoing letter was written after the requirement with respect to the acid test had been brought to the attention of the appellant and had been frequently referred to in the correspondence in the course of which it appeared that those acting for the appellant were acquainted with the test in question and knew the object of its use and the effect produced in its application. With this knowledge in regard to the test in question the appellant writes "we believe without doubt that we will be able to make you (the Government Printer) a shipment of your order during the next week;" and requests that the time be allowed for doing this. There is inconsistency between this and the claim here made that a paper to stand the Government test was a paper that the appellant could not, and had not agreed, to make.

In the light of what has been said as to the nature and effect of the contract which is in controversy the action of the Court upon the prayers of the respective parties will be noticed before considering other exceptions ; and those of the appellant will be first considered.    Of these the first two numbered 1 and 1½ sought to withdraw the case from the jury for insufficiency of evidence to support the plaintiffs' (appellees') action.    That these were properly refused appears from what has already been said.    In view of what we have found the contract in controversy to be all of the prayers of the appellant were necessarily rejected because they are all based upon the theory that the appellees, in making their bid to and contract with the Government for furnishing the paper in question, were under the obligation to do this for and on behalf of the appellant and at the price which the appellant had named for furnishing the paper ; and that the appellant was called upon to supply a paper that it had not contracted to supply because the paper required would be subjected to the acid test spoken of in the evidence to determine its correspondence with the sample which the Government supplied to bidders ; and that the appellant had not been informed of this at the time it made its contract to furnish paper.    Neither one of these propositions, as has been heretofore pointed out, is supported by the evidence in the cause.    These prayers, each and all, as respects the theory involving the evidence as to the acid test, ignore the fact that in making the proposal to furnish paper the appellant was supplied with a sample which it was told it had to match, and that there is no evidence to explain why with the sample to instruct it as to the exact character of the paper required it could not determine what that exact character of paper was.

The considerations mentioned are sufficient to dispose of all of the appellant's prayers without pointing out specific objections to each particular prayer.    It may be said, however, of the sixth and seventh prayers that they are also faulty in submitting a question of law to the jury in that they put it to the jury to find that, in making their bid to the Government, the

appellees did so as the agents of the appellant thereby leaving it to the jury to construe, and to say what was the nature of the contract under which the appellees were acting.

With respect to the plaintiffs' (appellees') prayers it has been argued in this Court that the first and second submitted a question of law to the jury.   As these are granted prayers, to bring such a question before this Court it is necessary that the record should show that it was presented to and decided by the Court below.   Code, 1904, Art. 5, sec. 9; 2 *Poe Plead. & Prac.*, secs. 298, 299, 299A.   The record here does not show that special exceptions, according to the usual practice, were filed to the prayers in question, nor that the objection here taken to them was made in the Court below.   It is not therefore available here.

The prayers of the plaintiffs proceeded upon a correct theory of the case and no other objection has been urged to their form than the one already noticed, and we discover no other as the first and second prayers.   The third prayer as to the measure of damages while it seems to state a correct rule for assessing damages under the facts of the case; or a rule as favorable to the defendant as it could ask is open to the criticism of being abstract in form, and in not referring sufficiently to the facts to instruct the jury in the application of the rule stated to the facts.   It is apparent however that no injury resulted from this.   There was no conflict of evidence in the evidence going to the damages in the case.   The plaintiffs evidence as to these was offered according to the rule stated and the verdict of the jury was evidently based on this evidence.

As to the other exceptions set out in the record they may be briefly disposed of.   The first was to the ruling of the Court refusing to grant a motion submitted at the close of plaintiffs testimony to strike out the same.   There was no error in this.   The testimony was proper and material as being in proof of plaintiffs' contract, as it had been alleged, and the breach thereof.   The second was to the refusal of a prayer offered at the conclusion of plaintiffs' testimony seeking to

withdraw the case from the jury and this has already been disposed of in passing upon defendant's prayers one and one and a-half.  The third was to the sustaining of objection by the Court to a question asked of one of the officials of the appellant who was being examined as a witness whether "under the specifications as contained in this correspondence could you (he) have furnished the paper in accordance with the specification and the sample furnished?" and the fourth to sustaining objection to the question what would have been this official's answer if he had been advised that one of the specifications by the Government was that "paper will not be received which contains bleached or unbleached sulphite pulp in greater quantity than the standard sample?"   There was no error in either of these rulings.   The time for the appellant to have determined whether it could manufacture the paper required to comply with its contract was before the contract was entered into.  And it must be held to have known that it could not comply with its contract to furnish paper according to the sample by manufacturing a paper that would be different from the sample which it would have done by putting into the paper or using in its manufacture what the sample did not contain. The fifth exception was to the objection sustained to a question to this same witness as to what he had to say to the testimony of one of the appellees, as a witness, that he, this appellee, did not know what kind of paper appellants' factory made or the substance of which it was made.   The sixth to the question to the same witness, "Did you make rope or jute paper;" and the seventh to the question "could rope or jute paper be made from unbleached sulphite?"   These questions were manifestly irrelevant and immaterial.   The issues were what was the contract which appellant had made; and, it being admitted, that it had not furnished any paper under the contract nor tendered any whether it had shown legal excuse for its failure in this regard.   The questions set out in these last exceptions could have elicited no evidence that would have been in the least material to either of these issues.

All of the rulings which have been made the subject of exception in·the trial of the case will be affirmed.

> *Judgment affirmed with costs to the appellees.*

(Decided April 20th, 1906.)

McSHERRY, C. J., PEARCE and SCHMUCKER, JJ., dissented.